UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SUNBELT RENTALS, INC.,

    Plaintiff,

v.                                                                    Case No: 6:26-cv-515-JSS-NWH

OLIVER JOSEPH, BRANDSAFWAY,
LLC, BRANDSAFWAY
INDUSTRIES, LLC,
BRANDSAFWAY SERVICES, LLC,
and BRANDSAFWAY SOLUTIONS,
LLC,

    Defendants.
_____/

## ORDER

Plaintiff, Sunbelt Rentals, Inc., sues Defendants, Oliver Joseph, BrandSafway, LLC, BrandSafway Industries, LLC, BrandSafway Services, LLC, and BrandSafway Solutions, LLC, asserting claims for breach of contract, tortious interference with a contractual relationship, tortious interference with business relations, and unjust enrichment. (Dkt. 29.)  Defendants move to dismiss the amended complaint. (Dkt. 31.)  Plaintiff opposes the motion. (Dkt. 44.)  Upon consideration, for the reasons outlined below, the court denies the motion.

## BACKGROUND

According to the unverified complaint, Sunbelt rents and sells a wide range of general industrial tools and equipment.  (*See* Dkt. 29 ¶ 19.)  The company has branch

offices throughout the United States, including one in Ocoee, Florida. (*See id.* ¶¶ 20–21.)

Joseph spent nearly twenty years working as a sales representative for Sunbelt. (*Id.* ¶ 23.) Throughout that time, Joseph primarily worked from Sunbelt's Ocoee office, and his sales territory reportedly stretched across Central Florida, including Kissimmee and parts of Orlando. (*See id.* ¶¶ 23–24.)

As a sales representative, Joseph was responsible for "maintaining and growing Sunbelt's business relationships and market share for scaffolding services in Central Florida." (*Id.* ¶ 25.) His role purportedly provided him access to Sunbelt's confidential customer information, pricing structures, and business strategies. (*See id.* ¶ 28.) Joseph acknowledged that he had access to such information in his employment agreement and agreed that the unauthorized use or disclosure of that information "would seriously damage [Sunbelt] in its [b]usiness." (*See* Dkt. 29-1 at 3–4.) Accordingly, Joseph's employment agreement contained several restrictive covenants. (*See id.* at 3–5.)

Sunbelt contends that three restrictive covenants are relevant here. (*See* Dkt. 29 ¶¶ 27–36, 111–112.) First, Joseph agreed that he would not "use, divulge, disclose, furnish, or make accessible to [anyone else] . . . any aspect of [Sunbelt's] [c]onfidential [i]nformation," without Sunbelt's prior written consent. (Dkt. 29-1 at 4.) According to Joseph's employment agreement, "[c]onfidential [i]nformation" includes:

> existing and future equipment information, customer lists, identities of distributors and distributorships, sales methods and techniques, costs and costing methods, pricing

> techniques and strategies, sales agreements with customers, profits and product line profitability information, unpublished present and future marketing strategies and promotional programs, and other information regarded by [Sunbelt] as proprietary and confidential.

(*Id.* at 3.)  Second, Joseph agreed that he would not compete with Sunbelt in selling or renting equipment, tools, and scaffolding, or in providing related services, such as "the erecting and dismantling of scaffolding," for at least one year following his employment. (*Id.* at 2, 4; *see* Dkt. 29 ¶ 33.)  This restriction applies to a 50-mile radius around any Sunbelt store in which, or in connection with which, Joseph was responsible for performing services during his last year of employment.  (*See* Dkt. 29-1 at 4–5.)  Third, Joseph agreed that he would not attempt to sell any products or services, similar to those which Sunbelt sells, to any customer with whom he had contact, for whom he had responsibility, or about whom he had access to confidential information during the final year of his employment with Sunbelt.  (*See* Dkt. 29 ¶ 30; Dkt. 29-1 at 4, 5.)  Like Joseph's non-compete clause, the non-solicitation provision also applies for one year following his employment with Sunbelt.  (*See* Dkt. 29-1 at 2, 5.)  The non-solicitation clause is slightly broader in geographic scope than the non-compete provision, as it applies not only to the 50-mile radius surrounding the Sunbelt stores "in which, or in connection with which," Joseph worked during his final year with Sunbelt, but also applies at any location where Joseph conducted business with Sunbelt customers during that year. (*See id.* at 2, 5.)

Joseph resigned from his role at Sunbelt in July 2025.  (Dkt. 29 ¶ 37.)  He soon joined one of Sunbelt's primary competitors in Central Florida: BrandSafway.  (*See id.*

¶¶ 37–40.)  As alleged, BrandSafway operates two branch offices in Central Florida: one in Orlando and one in Apopka.  (*See id.* ¶ 41.)  According to BrandSafway, Joseph's sales territory is limited to the Space Coast region of Florida, east of the Kennedy Space Center visitor's center.  (*See* Dkt. 29-1 at 25.)  Even so, several discoveries have led Sunbelt to conclude that Joseph is violating the restrictive covenants within his employment agreement.  (*See* Dkt. 29 ¶¶ 42, 46–106.)

To begin, Joseph purportedly "sent a scaffold quote containing Sunbelt's confidential customer information to his personal email address."  (*See id.* ¶¶ 86, 90.)  Sunbelt learned of the incident shortly after Joseph left the company and contacted BrandSafway.  (*See id.* ¶ 84; Dkt. 29-1 at 26.)  In response, BrandSafway assured Sunbelt that Joseph had forwarded the document to himself while he was still employed by Sunbelt, so that he could print it; Joseph did not share the document with anyone at BrandSafway and was directed to delete it.  (*See* Dkt. 29-1 at 26.)

Next, Joseph rented equipment to a Sunbelt customer in October 2025.  (*See* Dkt. 29 ¶¶ 46–49, 97.)  According to Sunbelt, the rental was problematic for two reasons: the client was someone Joseph had done business with during his final year at Sunbelt, and the worksite was in Titusville, which is within 50 miles of its Ocoee office.  (*See id.* ¶¶ 46–49; Dkt. 29-1 at 24, 29–30.)  Again, Sunbelt learned of the incident shortly after it occurred and contacted BrandSafway.  (*See* Dkt. 29-1 at 24.)

That same month, a customer purportedly asked Sunbelt to remove scaffolding from a project on which Joseph worked while at Sunbelt.  (*See* Dkt. 29 ¶¶ 73–83.)  A

sales representative later reported seeing BrandSafway scaffolding at the worksite. (*See id.* ¶ 81.) Sunbelt does not know why this customer asked it to remove the scaffolding, but it suspects Joseph is to blame. (*See id.* ¶ 82 ("*Upon information and belief*, . . . Joseph was involved in this customer's unusual decision to switch their scaffolding provider from Sunbelt to BrandSafway after the scaffolding had already been installed." (emphasis added)).

In November 2025, Chris Johnson, the sales representative who replaced Joseph and now covers his former territory, purportedly overheard a BrandSafway employee state that he was at an Orlando worksite at the behest of someone named Oliver. (*See id.* ¶¶ 57–58.) Sunbelt does not know whom the BrandSafway employee was referring to, but it believes that the employee was referring to Joseph. (*See id.* ¶ 59 ("*Upon information and belief*, . . . Joseph was utilizing this other BrandSafway employee to hide his involvement in competitive activities within his contractually-restricted [t]erritory." (emphasis added).)

Johnson also saw Joseph at a worksite in Kissimmee in December. (*See id.* ¶¶ 50–56.) According to Sunbelt, Joseph placed a bid for that project before leaving to join BrandSafway. (*See id.* ¶¶ 51–52.) Johnson visited the worksite after Sunbelt received an email inviting Joseph to tour. (*See id.* ¶¶ 52–53.) Based upon Joseph's presence at the site, Sunbelt concludes that he must have been "involved in the project despite . . . being contractually prohibited from providing scaffolding services in Kissimmee." (*See id.* ¶¶ 52, 56 ("*Upon information and belief*, BrandSafway's explanation that [the client for this worksite] was formally designated as the customer

of another employee was a smokescreen for . . . Joseph's involvement in this project." (emphasis added)).)

Finally, Johnson reportedly saw BrandSafway scaffolding at a client's worksite in Orange City later that month. (*See id.* ¶¶ 60–61.) Sunbelt does not know who at BrandSafway rented the scaffolding equipment in question, yet it seems to attribute the scaffolding to Joseph, as he was reportedly close to that client's representative when he worked for Sunbelt. (*See id.* ¶¶ 60–61.)

Sunbelt believes that these incidents are part of a broader effort to steal its business. (*See id.* ¶¶ 75–81.) According to the amended complaint, WaveCrest Masonry—the client who requested that Sunbelt remove its scaffolding—reportedly generated several hundred thousand dollars in scaffolding rental revenue the year before Joseph's departure. (*See id.* ¶ 75.) WaveCrest reportedly began doing less business with Sunbelt several months before Joseph left, and no longer does business with Sunbelt's Ocoee office. (*See id.* ¶¶ 75–76.) Sunbelt attributes its reduced business with WaveCrest to Joseph. (*See id.* ¶¶ 76–83.) Another client, Ron Kendall Masonry—the client that rented scaffolding from Joseph for its Titusville project in October and that was later seen using BrandSafway equipment at a worksite in Orange City—has also reduced its business with Sunbelt. (*See id.* ¶¶ 64–65.) According to Sunbelt, this client generated several hundred thousand dollars of scaffolding rental revenue for its Ocoee office the year before Joseph's departure but has consistently reduced its business with Sunbelt since then, to the point that Sunbelt "received minimal [C]entral-Florida-based scaffolding revenue from Ron Kendall in January

2026, and no rental revenue in February 2026." (*See id.* ¶ 65.) Sunbelt blames Joseph for the lost revenue. (*See id.* ¶ 66 ("*Upon information and belief*, all or part of this decline in rental revenue is attributable to . . . Joseph's competition and/or solicitation of Ron Kendall Masonry in violation of his Agreement." (emphasis added)).) Finally, Sunbelt alleges that Carvalho & Silva, which was purportedly among Joseph's most reliable customers and reportedly generated more than one hundred thousand dollars in scaffolding rental revenue for Sunbelt the year before his departure, has not done business with Sunbelt since that time. (*See id.* ¶¶ 69–72.) Sunbelt appears to attribute this loss to Joseph as well. (*See id.* ¶ 100 (stating that it suspects Joseph has solicited Carvalho & Silva's business since joining BrandSafway); *but see* Dkt. 29-1 at 43 (stating that "Joseph has no responsibility or involvement with" this client, and that they are "serviced by other BrandSafway personnel").)

On March 6, 2026, Sunbelt sued Joseph and a host of BrandSafway entities. (*See* Dkt. 1.) The court dismissed the initial complaint because it was a shotgun pleading. (Dkt. 28.) On March 27, 2026, Sunbelt filed an amended complaint, asserting four causes of action. (*See* Dkt. 29 ¶¶ 107–45.) In Count I, Sunbelt alleges that Joseph breached the non-solicitation and non-compete clauses of his employment agreement. (*See id.* ¶¶ 107–19.) In Count II, Sunbelt alleges that BrandSafway tortiously interfered with Joseph's contractual obligations when it "knowingly and without justification directed, induced, or permitted [him] to violate the [a]greement." (*See id.* ¶¶ 120–26.) In Count III, Sunbelt alleges that Joseph and BrandSafway "intentionally and improperly interfered with [its] business relations" by soliciting its

customers and otherwise engaging with them in a competitive capacity.  (*See id.* ¶¶ 127–36.)  Finally, in Count IV, Sunbelt alleges that Joseph and BrandSafway have been unjustly enriched by leveraging its "customer goodwill and relationships."  (*See id.* ¶¶ 137–45.)  Plaintiff seeks monetary damages, preliminary and permanent injunctive relief, and an accounting "of any compensation, commission, bonus, salary, gratuity, emolument, or other gain received, directly or indirectly, by Defendants in any transaction or employment connected with the breach of the Agreement or violation of federal or Florida law."  (*See id.* at 22.)

**APPLICABLE STANDARDS**

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To state a claim upon which relief may be granted, a complaint "must contain . . . a short and plain statement of the claim showing that the [plaintiff] is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Therefore, to satisfy Rule 8(a)(2) and survive a Rule 12(b)(6) challenge, the factual allegations in the complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not do.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Rather, "[a] complaint is plausible on its face when it contains sufficient facts to support a reasonable inference that the defendant is liable for the misconduct alleged," *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018), meaning that they "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged," *Iqbal*, 556 U.S. at 678.  To meet this standard, the facts alleged in the complaint must show more than "a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

Complaints that do not contain a short and plain statement of the claim showing that the plaintiff is entitled to relief "are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015).  Shotgun pleadings "fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323.

## ANALYSIS

Defendants raise two arguments in moving to dismiss the amended complaint. (*See* Dkt. 31.)  To begin, Defendants argue that the complaint should be dismissed in its entirety, as it remains a shotgun pleading.  (*See id.* at 5–10.)  Should the court disagree, Defendants contend that the court should order Plaintiff to provide a more definite statement.  (*See id.* at 10–11.)  The court addresses each argument in turn.

### A. Shotgun Pleading

The Eleventh Circuit has identified four variations of shotgun pleadings, each of which "fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *See Weiland*, 792 F.3d at 1320–23.  The most common variety consists of complaints that "contain[s] multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire

complaint." *Id.* at 1321.  Complaints that do not re-allege all preceding counts, but which are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action," are the next most common variety.  *Id.* at 1322.  The least common variety covers complaints "that commit[] the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."  *Id.* at 1323.  Defendants contend that the amended complaint is a shotgun pleading for two reasons.  (*See* Dkt. 31 at 5–10.)

The initial complaint was a shotgun pleading of the most common variety, as each count "adopt[ed] the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint."  *Weiland*, 792 F.3d at 1321; *see Smith v. Bos. Sci. Corp.*, No. 3:21-CV-815-MMH-JRK, 2021 WL 11132751, at *1 (M.D. Fla. Aug. 27, 2021) (striking a complaint as a shotgun pleading where each count stated that "[the p]laintiff reallege[d] and incorporate[d] by reference each and every allegation of th[e] [c]omplaint as if each were set forth fully and completely [t]herein").  (*See e.g.* Dkt. 1 at 19, 21 ("Sunbelt repeats and re-alleges Paragraphs 1-119 of this [c]omplaint and incorporates them herein in their entirety. . . . Sunbelt repeats and re-alleges Paragraphs 1-126 of this [c]omplaint and incorporates them herein in their entirety. . . . Sunbelt repeats and re-alleges Paragraphs 1-136 of this [c]omplaint and incorporates them herein in their entirety.").  The amended complaint corrects this deficiency, as each count identifies

the specific allegations supporting the cause of action and does not adopt preceding counts. (*See* Dkt. 29 ¶¶ 107, 120, 127, 137.)

Even so, Defendants claim that the amended complaint is a shotgun pleading that does not sufficiently identify which factual allegations relate to each of Plaintiff's four causes of action because Plaintiff incorporates all, or nearly all, of its factual allegations in each cause of action. (*See* Dkt. 31 at 6–8.) To be sure, each count incorporates many factual allegations, but the complaint is not a rambling, narrative, replete with conclusory allegations and legal jargon. (*See* Dkt. 29.) Nor are the facts presented in an incoherent or disorganized narrative, making it extremely difficult to determine what Plaintiff alleges happened. (*See id.*) Because the basis for each cause of action is clear, and it is not "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief," *Weiland*, 792 F.3d at 1325, the amended complaint is not a shotgun pleading replete with conclusory, vague, and immaterial allegations, *see Barmapov v. Amuial*, 986 F.3d 1321, 1325 (11th Cir. 2021).

Defendants also argue that the amended complaint is a shotgun pleading of the least common variety because Plaintiff "makes allegations collectively against all 'Defendants' generally, instead of against each particular defendant." (*See* Dkt. 31 at 8–9.) To be sure, the amended complaint generally refers to the BrandSafway entities collectively and even uses the term "Defendants" to refer to all five Defendants in Counts III and IV. (*See* Dkt. 29.) Even so, each count incorporates factual allegations that distinguish between Joseph and the BrandSafway entities. (*See id.* ¶¶ 107, 120, 127, 137). As a result, Plaintiff's collective use of the term "Defendants" in Counts III

- 11 -

and IV does not, as Defendants suggest, render the allegations in the amended complaint so vague that Defendants cannot determine what Plaintiff is alleging.  (*See id. passim*; Dkt. 31 at 9.)

Plaintiff's collective references to the BrandSafway entities do not render the amended complaint a shotgun pleading either.  Where "[t]he complaint can be fairly read to aver that all Defendants are responsible for the alleged conduct," the failure to specify which Defendant took a particular action is not necessarily fatal.  *See Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000); *Crowe v. Coleman*, 113 F.3d 1536, 1539 (11th Cir. 1997) (explaining that a plaintiff may plead claims against multiple defendants by referring to them collectively, and allegations "usually are to be read in such a way that each defendant is having the allegation made about him individually").  Notably, the amended complaint does not make broad allegations about "a large and diverse group of defendants."  *See 1-800-411-I.P. Holdings, LLC v. Ga. Inj. Ctrs., LLC*, 71 F. Supp. 3d 1325, 1330 (S.D. Fla. 2014) ("Collective references to defendants most often create problems when broad allegations are directed at a large and diverse group of defendants, leaving unclear just who is alleged to have committed which acts."); *Pierson v. Orlando Reg'l Healthcare Sys.*, 619 F. Supp. 2d 1260, 1271 (M.D. Fla. 2009) (concluding that a plaintiff impermissibly lumped several defendants together throughout the complaint, as the reader was often left to guess as to which defendants were being discussed in connection with the alleged conduct).  Rather, Plaintiff collectively refers to the BrandSafway entities because it does not yet know which of these entities employs Joseph and is thus involved in the alleged conduct.

(*See* Dkt. 42 at 7–8.)  Defendants cite no authority to support the proposition that this is improper.   Accordingly, Defendants have not shown that Plaintiff's collective allegations render the amended complaint such that they lack "adequate notice of the claims against them and the grounds upon which each claim rests."  *Weiland*, 792 F.3d at 1323.  The court therefore denies Defendants' motion to dismiss the third amended complaint as a shotgun pleading.

### B.  Request for a More Definite Statement

Federal Rule of Civil Procedure 12(e) "permits a party to move for a more definite statement when a pleading 'is so vague or ambiguous that the party cannot reasonably prepare a response.'"  *Marshall v. Mayor of Savannah*, 366 F. App'x 91, 101 (11th Cir. 2010) (quoting Fed. R. Civ. P. 12(e)); *see Weiland*, 792 F.3d at 1324 (explaining that a motion for a more definite statement is properly used "where a failure to more precisely parcel out and identify the facts relevant to each claim materially increase[s] the burden of understanding the factual allegations underlying each count").  Motions for more definite statement are intended to provide a remedy for an unintelligible pleading; they are not a vehicle for obtaining greater detail.  *S. Y. v. Wyndham Hotels & Resorts, Inc.*, 521 F. Supp. 3d 1173, 1197 (M.D. Fla. 2021); *see Aventura Cable Corp. v. Rifkin/Narragansett S. Fla. CATV Ltd. Pshp.*, 941 F. Supp. 1189, 1195 (S.D. Fla. 1996) ("The motion [for more definite statement under Rule 12(e)] is intended to provide a remedy for an unintelligible pleading, rather than a vehicle for obtaining greater detail.").  "[C]ourts generally disfavor such motions."  *Aventura Cable*

*Corp.*, 941 F. Supp. at 1195 (citing *Campbell v. Miller*, 836 F. Supp. 827, 832 (M.D. Fla. 1993)); *Fathom Expl., LLC v. The Unidentified Shipwrecked Vessel Or Vessels*, 352 F. Supp. 2d 1218, 1221 (S.D. Ala. 2005) ("Motions for more definite statement are viewed with disfavor and are rarely granted."); *Faulk v. Home Oil Co.*, 173 F.R.D. 311, 313 (M.D. Ala. 1997) ("In general, motions for a more definite statement are disfavored under the liberal pleading approach of the Federal Rules.").

Here, Defendants argue that "the [c]ourt should order Plaintiff to provide a more definite statement that: (1) specifies the alleged rights [and] laws [that] each Defendant has purportedly violated[,] (2) identifies which facts apply to each claim[,] and (3) clearly ties the specific factual allegations to the elements of the causes of action so that each individual defendant can understanding what they allegedly did to violate Plaintiff's rights or the law." (*See* Dkt. 31 at 10–11.) Defendants do not elaborate on these requests. (*See id.*) Accordingly, it is unclear what additional clarity Defendants seek. (*See id.*) The cursory nature of Defendant's analysis is fatal to their request for a more definite statement, as a party abandons issues that it raises in passing, asserts perfunctorily, buries within its brief, or uses merely to support other arguments. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681–82 (11th Cir. 2014).

In any case, as discussed, the amended complaint identifies the facts supporting each cause of action. (*See* Dkt. 29 ¶¶ 107, 120, 127, 137.) Accordingly, it is unclear what additional clarity Defendants seek with respect to the facts supporting each claim. (*See* Dkt. 31 at 10–11.) The amended complaint also ties Plaintiff's factual allegations to the elements of each claim. (*See* Dkt. 29 ¶¶ 107–145.) Finally, the

amended complaint specifically identifies Plaintiff's theories of liability: breach of contract, tortious interference, and unjust enrichment. (*See id.*) Simply put, the amended complaint is not so vague or ambiguous as to require additional clarification. *See Marshall*, 366 F. App'x at 101. Because Defendants' motion seeks a more detailed, rather than a more unambiguous, complaint, the court will not require Plaintiff to provide a more definite statement. *See Weiland*, 792 F.3d at 1324; *S. Y.*, 521 F. Supp. 3d at 1197.

Accordingly, Defendants' motion to dismiss (Dkt. 31) is **DENIED**.

**ORDERED** in Orlando, Florida, on June 2, 2026.

_____
JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

- 15 -