UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SUNBELT RENTALS, INC.,

    Plaintiff,

v.                                                                 Case No: 6:26-cv-515-JSS-NWH

OLIVER JOSEPH, BRANDSAFWAY,
LLC, BRANDSAFWAY
INDUSTRIES, LLC,
BRANDSAFWAY SERVICES, LLC,
and BRANDSAFWAY SOLUTIONS,
LLC,

    Defendants.
_____/

## ORDER

Plaintiff, Sunbelt Rentals, Inc., sues Defendants, Oliver Joseph, BrandSafway, LLC, BrandSafway Industries, LLC, BrandSafway Services, LLC, and BrandSafway Solutions, LLC, asserting claims for breach of contract, tortious interference with a contractual relationship, tortious interference with business relations, and unjust enrichment. (Dkt. 29.) Sunbelt now moves to enjoin Joseph from violating the restrictive covenants within his employment agreement, and to enjoin BrandSafway from tortiously interfering with Joseph's employment agreement and Sunbelt's customer relationships. (*See* Dkt. 30.) Defendants oppose the motion. (*See* Dkt. 42.) Upon consideration, for the reasons outlined below, the court denies the motion.

## BACKGROUND

According to the unverified complaint, Sunbelt rents and sells a wide range of general industrial tools and equipment. (*See* Dkt. 29 ¶ 19.) The company has branch offices throughout the United States, including one in Ocoee, Florida. (*See id.* ¶¶ 20–21.)

Joseph spent nearly twenty years working as a sales representative for Sunbelt. (*Id.* ¶ 23 (alleging that Sunbelt employed Joseph "as an [o]utside [s]ales [r]epresentative for scaffolding rental services and solutions," beginning in 2010); *see* Dkt. 30 at 2; Dkt. 42 at 2 ("Joseph devoted more than twenty-five years of service to Sunbelt Rentals, including nearly two decades as an [o]utside [s]ales [r]epresentative servicing customers in the Orlando, Florida area.").) Throughout that time, Joseph primarily worked from Sunbelt's Ocoee office, (Dkt. 29 ¶ 23; Dkt. 30 at 2; Dkt. 30-1 at 10; Dkt. 42 at 2), and his sales territory reportedly stretched across Central Florida, including Kissimmee and parts of Orlando, (*see* Dkt. 29 ¶ 24; Dkt. 42-1 ¶ 5 ("At Sunbelt, I worked out of Branch #67 in Ocoee, Florida[,] and serviced parts of the Central[] Florida area, including parts of Orange, Osceola, and Polk counties.")).

As a sales representative, Joseph was responsible for "maintaining and growing Sunbelt's business relationships and market share for scaffolding services in Central Florida." (Dkt. 29 ¶ 25.) His role purportedly provided him access to Sunbelt's confidential customer information, pricing structures, and business strategies. (*See id.* ¶ 28, Dkt. 30 at 2). Joseph acknowledged that he had access to such information in his employment agreement and agreed that the unauthorized use or disclosure of that

information "would seriously damage [Sunbelt] in its [b]usiness." (*See* Dkt. 29-1 at 3–4.)   Accordingly, Joseph's employment agreement contained several restrictive covenants.  (*See id.* at 3–5; Dkt. 30 at 2–3 ("To safeguard this valuable information, [] Joseph signed an [e]mployment [a]greement that includes a [one]-year non-compete and non-solicitation restrictions, subject to tolling in the event of a violation, and confidentiality and non-disclosure provisions.").

Sunbelt contends that three restrictive covenants are relevant here.  (*See* Dkt. 30 at 11.)  First, Joseph agreed that he would not "use, divulge, disclose, furnish, or make accessible to [anyone else] . . . any aspect of [Sunbelt's] [c]onfidential [i]nformation," without Sunbelt's prior written consent.  (Dkt. 29-1 at 4.)   According to Joseph's employment agreement, "[c]onfidential [i]nformation" includes:

> existing and future equipment information, customer lists, identities of distributors and distributorships, sales methods and techniques, costs and costing methods, pricing techniques and strategies, sales agreements with customers, profits and product line profitability information, unpublished present and future marketing strategies and promotional programs, and other information regarded by [Sunbelt] as proprietary and confidential.

(*Id.* at 3.)  Second, Joseph agreed that he would not compete with Sunbelt in selling or renting equipment, tools, and scaffolding, or in providing related services, such as "the erecting and dismantling of scaffolding," for at least one year following his employment.  (Dkt. 29-1 at 2, 4; *see* Dkt. 29 ¶ 33; Dkt. 30 at 3 ("Joseph . . . agreed to a one[-]year noncompetition restriction barring him from directly or indirectly engaging in any business that is the same as, or substantially similar to, Sunbelt's [b]usiness.").

This restriction applies to a 50-mile radius "around any Sunbelt store in which, or in connection with which, [Joseph] was responsible for performing services during his last year of employment." (Dkt. 30 at 3; *see* Dkt. 29-1 at 4–5.)  Third, Joseph agreed that he would not attempt to sell any products or services, "similar to those" which Sunbelt sells, to any customer with whom he had contact, for whom he had responsibility, or about whom he had access to confidential information during the final year of his employment with Sunbelt. (Dkt. 30 at 3–4; *see* Dkt. 29 ¶ 30; Dkt. 29-1 at 4, 5.)  Like Joseph's non-compete clause, the non-solicitation provision also applies for one year following his employment with Sunbelt. (Dkt. 30 at 3–4; *see* Dkt. 29-1 at 2, 5.)  The non-solicitation clause is slightly broader in geographic scope than the non-compete provision, as it applies not only to the 50-mile radius surrounding the Sunbelt stores "in which, or in connection with which," Joseph worked during his final year with Sunbelt, but also applies "at any location where [Joseph] conducted business with [Sunbelt] customers" during that year. (Dkt. 30 at 3–4; *see* Dkt. 29-1 at 2, 5.)

Joseph resigned from his role at Sunbelt in July 2025. (Dkt. 29 ¶ 37.)  He soon joined one of Sunbelt's primary competitors in Central Florida: BrandSafway. (*See id.* ¶¶ 37–40; Dkt. 30 at 5.)  As alleged, BrandSafway operates two branch offices in Central Florida: one in Orlando and one in Apopka. (*See* Dkt. 30 at 5.)  According to Joseph, he is a project manager, assigned to a sales territory that "is limited to the Space Coast region of Florida, east of the Kennedy Space Center visitor's center." (Dkt. 42-1 ¶ 22; *see* Dkt. 29-1 at 25; *see also* Dkt. 42 at 4 ("Joseph is not assigned [to]

territories in Central Florida areas such as Ocoee, Orlando, Kissimmee, Apopka, or Tampa.").) Even so, several discoveries have led Sunbelt to conclude that Joseph is violating the restrictive covenants within his employment agreement. (*See* Dkt. 29 ¶¶ 42, 46–106.)

To begin, Joseph purportedly "sent a scaffold quote containing Sunbelt's confidential customer information to his personal email address." (*See id.* ¶¶ 86, 90.) Sunbelt learned of the incident shortly after Joseph left the company and contacted BrandSafway. (*See id.* ¶ 84; Dkt. 29-1 at 26.) In response, BrandSafway assured Sunbelt that Joseph had forwarded the document to himself while he was still employed by Sunbelt, so that he could print it; Joseph did not share the document with anyone at BrandSafway and was directed to delete it. (*See* Dkt. 29-1 at 26.)

Next, Joseph rented equipment to one of Sunbelt's customers in October 2025. (*See* Dkt. 29 ¶¶ 46–49, 97; *see also* Dkt. 30-1 at 5–6.) According to Sunbelt, the rental was problematic for two reasons: the client was someone Joseph had done business with during his final year at Sunbelt, and the worksite was in Titusville, which is within 50 miles of its Ocoee office. (*See* Dkt. 29 ¶¶ 46–49; Dkt. 29-1 at 24, 29–30.) Again, Sunbelt learned of the incident shortly after it occurred and contacted BrandSafway. (*See* Dkt. 29-1 at 24.)

That same month, a customer purportedly asked Sunbelt to remove scaffolding from a project that Joseph worked on while at Sunbelt. (*See* Dkt. 30-1 at 3–4; *see also* Dkt. 29 ¶ 73 (alleging that the client for this project "was also one of . . . Joseph's customers during his employment with Sunbelt").) A sales representative later

reported seeing BrandSafway scaffolding at the worksite. (*See* Dkt. 30-1 at 4.) Sunbelt does not know why this customer asked it to remove the scaffolding, but it suspects Joseph is to blame. (Dkt. 29 ¶ 82 ("*Upon information and belief*, . . . Joseph was involved in this customer's unusual decision to switch their scaffolding provider from Sunbelt to BrandSafway after the scaffolding had already been installed." (emphasis added)).

In November 2025, Chris Johnson, the sales representative who replaced Joseph and now covers his former territory, reports overhearing a BrandSafway employee state that he was at an Orlando worksite at the behest of someone named Oliver. (*See* Dkt. 30-1 at 5.) Sunbelt does not know whom the BrandSafway employee was referring to, but it believes that the employee was referring to Joseph. (*See id.*; Dkt. 29 ¶¶ 57–59 ("*Upon information and belief*, . . . Joseph was utilizing this other BrandSafway employee to hide his involvement in competitive activities within his contractually-restricted Territory." (emphasis added)); Dkt. 30 at 7 (asserting that this interaction "*indicat[es]* that . . . Joseph had intended to be present" at a worksite within his former territory but was "attempting to hide his involvement by operating through another BrandSafway employee" (emphasis added).)

Johnson also reports seeing Joseph at a worksite in Kissimmee in December. (*See* Dkt. 30-1 at 2–3; *see also* Dkt. 29 ¶¶ 50–56; Dkt. 30 at 6–7.) According to Sunbelt, Joseph placed a bid for that project before leaving to join BrandSafway. (*See* Dkt. 29 ¶¶ 51–52; Dkt. 30-1 at 11.) Johnson visited the worksite after Sunbelt received an email inviting Joseph to tour. (*See* Dkt. 29 ¶ 52; Dkt. 30-1 at 2–3.) Based upon Joseph's presence at the site, Sunbelt concludes that he must have been "involved in the project

despite . . . being contractually prohibited from providing scaffolding services in Kissimmee."   (*See* Dkt. 29 ¶¶ 52, 56 ("*Upon information and belief*, BrandSafway's explanation that [the client for this worksite] was formally designated as the customer of another employee was a smokescreen for . . . Joseph's involvement in this project." (emphasis added)); Dkt. 30 at 7 (same); *but see* Dkt. 29-1 at 43 (stating that "Joseph has no responsibility or involvement with" this client, and that the account is "serviced by other BrandSafway personnel").)

Finally, Johnson mentions seeing BrandSafway scaffolding at a client's worksite in Orange City later that month.  (*See* Dkt. 30-1 at 6.)  Sunbelt does not know who at BrandSafway rented the scaffolding equipment in question, yet it attributes the scaffolding to Joseph, as he was reportedly close to that client's representative when he worked for Sunbelt.  (*See* Dkt. 29 ¶¶ 60–61; Dkt. 30 at 7 (arguing that the presence of BrandSafway equipment at a client's worksite, within Joseph's restricted territory, reinforces the conclusion that Joseph must be violating his contractual obligations).)

Sunbelt believes that these incidents are part of a broader effort to steal its business.  (*See* Dkt. 29 ¶¶ 75–81; Dkt. 30 at 8 ("Sunbelt has observed significant decreases in [scaffolding] rental revenue from several of [Joseph's] former Sunbelt Customers: Ron Kendall Masonry, Carvalho & Silva Construction, and WaveCrest Masonry.").)  As alleged in the amended complaint, WaveCrest Masonry—the client who requested that Sunbelt remove its scaffolding—reportedly generated several hundred thousand dollars in scaffolding rental revenue the year before Joseph's departure.  (*See* Dkt. 29 ¶ 75.)  WaveCrest reportedly began doing less business with

Sunbelt several months before Joseph left, and no longer does business with Sunbelt's Ocoee office. (*See id.* ¶¶ 75–76; Dkt. 30-1 at 11 ("Since . . . Joseph left, WaveCrest has gone from one of the top rental accounts for [the Ocoee office], to doing no business with Sunbelt.").) Sunbelt attributes its reduced business with WaveCrest to Joseph. (*See* Dkt. 29 ¶¶ 76–83.) Another client, Ron Kendall Masonry—the client that rented scaffolding from Joseph for its Titusville project in October and that was later seen using BrandSafway equipment at a worksite in Orange City—has also reduced its business with Sunbelt. (*See id.* ¶¶ 64–65; *see* Dkt. 30-1 at 4–5.) According to Sunbelt, this client generated several hundred thousand dollars of scaffolding rental revenue for its Ocoee office the year before Joseph's departure, but has consistently reduced its business with Sunbelt since then, to the point that Sunbelt "received minimal [C]entral-Florida-based scaffolding revenue from Ron Kendall in January 2026, and no rental revenue in February 2026." (Dkt. 29 ¶ 65.) Sunbelt blames Joseph for the lost revenue. (*See id.* ¶ 66 ("*Upon information and belief*, all or part of this decline in rental revenue is attributable to . . . Joseph's competition and/or solicitation of Ron Kendall Masonry in violation of his Agreement." (emphasis added)).) Finally, Sunbelt alleges that Carvalho & Silva, which was purportedly among Joseph's most reliable customers, such that it reportedly generated more than one hundred thousand dollars in scaffolding rental revenue for Sunbelt the year before his departure, has not done business with Sunbelt since that time. (*See id.* ¶¶ 69–72.) Sunbelt appears to attribute this loss to Joseph as well. (*See id.* ¶ 100 (stating that it suspects Joseph has solicited Carvalho & Silva's business since joining BrandSafway); *but see* Dkt. 29-1 at 43 (stating

that "Joseph has no responsibility or involvement with" this client, and that they are "serviced by other BrandSafway personnel").)

On March 6, 2026, Sunbelt sued Joseph and a host of BrandSafway entities. (*See* Dkt. 1.) The court dismissed the initial complaint because it was a shotgun pleading. (Dkt. 28.) On March 27, 2026, Sunbelt filed an amended complaint, asserting four causes of action. (*See* Dkt. 29 ¶¶ 107–45.) In Count I, Sunbelt alleges that Joseph breached the non-solicitation and non-compete clauses of his employment agreement. (*See id.* ¶¶ 107–19.) In Count II, Sunbelt alleges that BrandSafway tortiously interfered with Joseph's contractual obligations when it "knowingly and without justification directed, induced, or permitted [him] to violate the [a]greement." (*See id.* ¶¶ 120–26.) In Count III, Sunbelt alleges that Joseph and BrandSafway "intentionally and improperly interfered with [its] business relations" by soliciting its customers and otherwise engaging with them in a competitive capacity. (*See id.* ¶¶ 127–36.) Finally, in Count IV, Sunbelt alleges that Joseph and BrandSafway have been unjustly enriched by leveraging its "customer goodwill and relationships." (*See id.* ¶¶ 137–45.) Sunbelt now asks that the court preliminarily enjoin Joseph and BrandSafway from violating the restrictive covenants contained in Joseph's employment agreement, "from tortiously interfering with the [a]greement," and from further interfering with its customer relationships. (Dkt. 30 at 1; *see id.* at 15 ("Sunbelt respectfully requests entry of a preliminary injunction enforcing . . . Joseph's contractual non-competition, non-solicitation, and confidentiality obligations during the pendency of this action.").

Defendants deny Sunbelt's allegations and argue that its motion for preliminary injunctive relief should be denied for five reasons.  (*See* Dkts. 42.)  First, Defendants contend that Sunbelt's motion should be denied, as its "requested relief is far too vague and overbroad to permit entry of a lawful injunction."  (*See id.* at 6–7.)   Second, Defendants maintain that injunctive relief is inappropriate because Sunbelt cannot show that it will suffer irreparable harm, absent such relief, as it waited nearly eight months after learning that Joseph joined a direct competitor to file suit and seek injunctive relief.  (*See id.* at 4, 7–9.)  Third, Defendants assert that injunctive relief is unnecessary, as Plaintiff seeks damages for Joseph's alleged breach of contract, suggesting that its alleged injury can be remedied monetarily.  (*See id.* at 5, 9–10.)  Fourth, Defendants argue that injunctive relief is improper because Sunbelt cannot demonstrate that it is likely to succeed on the merits of its breach of contract claim.  (*See id.* at 5, 10–20.)   Fifth, Defendants contend that Sunbelt cannot enjoin BrandSafway from tortiously interfering with Joseph's obligations under his employment agreement and with Sunbelt's customer relationships, as Sunbelt limited the scope of its motion to its breach of contract claim.  (*See id.* at 20.)

## APPLICABLE STANDARDS

"[F]ederal courts sitting in diversity apply state substantive law and federal procedural law."  *TransUnion Risk & Alt. Data Sols., Inc. v. MacLachlan*, 625 F. App'x 403, 405 (11th Cir. 2015).  When a plaintiff seeks a preliminary injunction to prevent the continued violation of Florida law, state law will guide the court's analysis of substantive matters, while federal law will guide the court's analysis of procedural

matters. *See id.* at 406. If the applicable state and federal laws do not conflict, "the court can apply [both laws] . . . harmoniously to the issue at hand." *Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1307 (11th Cir. 2002).

Federal Rule of Civil Procedure 65 governs a party's entitlement to injunctive relief in federal court; it provides "the procedural requirements and legal and factual findings [that] a district court must make before it may enter [such] relief." *AcryliCon USA, LLC v. Silikal GmbH & Co.*, 46 F.4th 1317, 1325 (11th Cir. 2022); *see Mitsubishi Int'l Corp. v. Cardinal Textile Sales*, 14 F.3d 1507, 1525 (11th Cir. 1994) (observing that Rule 65, "rather than [state] law, governs the grant of a preliminary injunction to preserve the relative positions of the parties until a trial on the merits can be held"). There are four prerequisites to obtaining preliminary injunctive relief under Rule 65: (1) the movant must show that it has a substantial likelihood of success on the merits of its claim, (2) the preliminary injunction must be necessary to prevent irreparable injury, (3) the threatened injury must outweigh the harm that the preliminary injunction would cause to the non-movant, and (4) the preliminary injunction must not be averse to the public interest. *See FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017); *accord* M.D. Fla. R. 6.01(b), 6.02(a)(1).

"[A] preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018); *accord McMahon v. Cleveland Clinic Found. Police Dep't*, 455 F. App'x 874, 878 (11th Cir. 2011) ("The grant of a preliminary injunction in advance of trial is an extraordinary remedy." (quotation omitted)).

- 11 -

Indeed, preliminary injunctions are "the exception, not the rule." *Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1275 (M.D. Fla. 2020). They "should not be issued unless the moving party clearly establishes each of the four prerequisites," *TransUnion Risk & Alt. Data Sols., Inc.*, 625 F. App'x at 405, with "specific facts— supported by a verified complaint, an affidavit, or other evidence—demonstrating an entitlement to relief," M.D. Fla. R. 6.01(a)(1), 6.02(a)(1).

If a court grants a motion for a preliminary injunction, the order must "state the reasons why it issued[,] . . . state its terms specifically[,] and . . . describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). Rule 65 also states: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *accord* M.D. Fla. R. 6.01(a)(4) (requiring a TRO motion to "include . . . a precise and verified explanation of the amount and form of the required security"); M.D. Fla. R. 6.02(a)(1) (requiring the same of a preliminary injunction motion).

## ANALYSIS

As discussed, there are four prerequisites for obtaining a preliminary injunction: likelihood of success on the merits, irreparable injury, balance of harms, and public interest. *See FF Cosms. FL, Inc.*, 866 F.3d at 1298. The failure to satisfy any one of these prerequisites is fatal to a request for injunctive relief. *Grayson v. Comm'r, Ala.*

*Dep't of Corr.*, 121 F.4th 894, 896 (11th Cir. 2024); *see Powers v. Nielsen*, 806 F. App'x 958, 959 (11th Cir. 2020) (stating that a movant's failure to satisfy any of the four prerequisites for injunctive relief is fatal to such a request); *see also Siegel v. LePo*re, 234 F.3d 1163, 1176 (11th Cir. 2000) (explaining that, even if a movant "establish[es] a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper"); *McMahon*, 455 F. App'x at 878 ("If the plaintiff fails to show a substantial likelihood of success on the merits, the court need not consider the other requirements."). Sunbelt has not shown that it is likely to succeed on the merits of its breach of contract claim or that it will suffer irreparable harm absent injunctive relief.

## A. Contractual Entitlement to Injunctive Relief

To begin, Sunbelt emphasizes that, in signing his employment agreement, Joseph agreed that "any breach or threatened breach" of the restrictive covenants contained therein "would entitle Sunbelt to injunctive relief." (Dkt. 30 at 4; *see* Dkt. 29 ¶ 35; Dkt. 29-1 at 5.) As discussed, injunctive relief is "never awarded as of right." *See Benisek*, 585 U.S. at 158; *accord Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy [that is] *never awarded as of right*." (emphasis added)); *Grayson*, 121 F.4th at 896 ("A preliminary injunction is an extraordinary remedy never awarded as of right." (quotation omitted)). Consequently, the consensus in this circuit is that "contractual provisions regarding entitlement to [such] relief are accorded little to no weight." *Dragon Jade Int'l, Ltd. v. Ultroid, LLC*,

No. 8:17-CV-2422-T-27TBM, 2018 WL 1833160, at *4 (M.D. Fla. Jan. 30, 2018) (collecting cases); *see Pliteq, Inc. v. Mostafa*, 775 F. Supp. 3d 1231, 1261 (S.D. Fla. 2025) ("In discussing the weight accorded to contractual provisions creating entitlement to injunctive relief, district courts have generally accorded them little to no weight, finding that such a contract provision is not dispositive of the issue of irreparable harm, does not in and of itself create a presumption of irreparable harm, nor is it binding upon the [c]ourt." (quotation omitted)); *B&G Equip. Co., Inc. v. Airofog USA, LLC*, No. 8:19-CV-403-T-36AEP, 2019 WL 2537792, at *3 (M.D. Fla. June 20, 2019) ("[A]lthough a contract may reflect the parties' agreement that any breach will result in irreparable harm for which no adequate remedy exists at law, such a contract provision is not dispositive of the issue of irreparable harm, does not in and of itself create a presumption of irreparable harm, nor is it binding upon the Court." (quotation omitted)).  Sunbelt's request for injunctive relief must therefore stand on its own merit.

## B. Likelihood of Success on the Merits

"[I]njunctive relief may not be granted unless the plaintiff establishes the substantial likelihood of success criterion." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005).  To carry their burden, a plaintiff must show that they have a strong chance of succeeding on at least one of their claims.  *See, e.g.*, *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, No. 25-11881, 2025 WL 3458571, at *2 (11th Cir. Nov. 25, 2025); *see Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 340 (1999) ("A plaintiff with questionable claims cannot show a likelihood of success.").

"It is not enough that the chance of success on the merits be better than negligible." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1286 (11th Cir. 2021).

Sunbelt ties its request for injunctive relief to its breach of contract claim in Count I of the amended complaint.  (*See* Dkt. 30 at 10–13.)  To state a claim for breach of contract in Florida, Sunbelt must "plead and establish" three elements: "(1) the existence of a contract[,] (2) a material breach of that contract[,] and (3) damages resulting from the breach."  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009); *accord Butterworth v. Lab. Corp. of Am. Holdings*, 581 F. App'x 813, 818 (11th Cir. 2014) ("For a breach of contract claim, Florida law requires the plaintiff to plead and establish, among other things: (1) the existence of a contract[] and (2) a material breach of that contract. A material breach of contract allows the non-breaching party to treat the breach as a discharge of its contractual liability." (citation omitted)).

When a breach of contract claim "is based upon enforcement of a restrictive covenant, however, the plaintiff must plead and prove additional elements in order to establish that the restrictive covenant is a valid restraint of trade."  *Rauch v. AJP Pine Island Warehouses, Inc.*, 313 So. 3d 625, 630 (Fla. Dist. Ct. App. 2021).  Specifically, a plaintiff must plead and prove that (1) "the restrictive covenant [is] set forth in a writing signed by the person against whom enforcement is sought," (2) "one or more legitimate business interests justify[] the restrictive covenant," and (3) "the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests [that] justify[] the restriction."  *Id.* at 630 (quotation omitted); *accord Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1291 (11th Cir. 2022) ("For

a restrictive covenant to be valid, the [party] seeking enforcement of the restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant."); *see* Fla. Stat. § 542.335(1)(b)(3) ("The person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant."). "Once the proponent of the injunction has established that the restraint is reasonably necessary to protect a legitimate business interest, the burden shifts to the opposing party to establish that the agreement is overbroad or otherwise not reasonably necessary." *4UOrtho, LLC v. Prac. Partners, Inc.*, 18 So. 3d 41, 43 (Fla. Dist. Ct. App. 2009). Sunbelt has not shown that it is likely to succeed on the merits of this claim for several reasons.

To begin, Sunbelt has not shown that it is likely to succeed on the merits of its breach of contract claim, as its motion does not address whether Joseph materially breached his employment agreement. (*See* Dkt. 30 at 10–14.) *See Vega*, 564 F.3d at 1272. In discussing the likelihood that it will succeed on the merits of its breach of contract claim, Sunbelt makes only a general reference to the "[e]xamples of . . . Joseph's [c]ompetitive [a]ctivities" that are discussed in the background section of its motion. (*See* Dkt. 30 at 13 ("After joining BrandSafway, . . . Joseph engaged in repeated competitive activity within the restricted Territory, such as Titusville, Kissimmee, and Orange City.").) As a result, Sunbelt does not tie the examples of Joseph's purportedly competitive behavior to its breach of contract claim or discuss whether the alleged infractions materially breach Joseph's employment agreement.

(*See id.* at 3–14.)  That is problematic because Sunbelt is responsible for "fram[ing] the issues for decision," *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (quotation omitted), and "advancing the facts and arguments entitling [it] to relief," *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (quotation omitted).  By failing to discuss whether Joseph materially breached his employment agreement, Sunbelt "almost certainly abandoned" the argument that it is substantially likely to succeed on the merits of its claim.  *See LaCourse v. PAE Worldwide Inc.*, 980 F.3d 1350, 1353 (11th Cir. 2020) (concluding that a plaintiff who failed to connect the allegations scattered throughout the background section of her brief to the later discussion of her claim "almost certainly abandoned" her argument); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681–82 (11th Cir. 2014) (explaining that a party abandons issues that it raises in passing, asserts perfunctorily, buries within its brief, or uses merely to support other arguments); *see also United States v. Markovich*, 95 F.4th 1367, 1379 (11th Cir. 2024) (concluding that a plaintiff forfeited arguments that were not supported by legal authority).  For that reason alone, injunctive relief is inappropriate.  *See Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1353 (S.D. Fla. 2002) (explaining that a movant's likelihood of success on the merits is measured by the movant's ability to satisfy each element of their cause of action).

Sunbelt also fails to show that it is likely to succeed on its breach of contract claim because it has not shown that a legitimate business interest supports the restrictive covenants in Joseph's employment agreement.  A contractual provision that restricts competition must be supported by a legitimate business interest to be

enforceable.  *See White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774, 779, 785 (Fla. 2017); *accord Rauch*, 313 So. 3d at 630 (explaining that a restrictive covenant, which is not supported by a legitimate business interest, is unlawful, void, and unenforceable).  A legitimate business interest is necessary because Florida law "does not protect covenants whose sole purpose is to prevent competition per se," as such provisions "are void against public policy." *See White*, 226 So. 3d at 779, 785; *see Envtl. Servs. v. Carter*, 9 So. 3d 1258, 1261 (Fla. Dist. Ct. App. 2009) ("Post-employment restrictive covenant agreements are valid restraints of trade or commerce *under certain conditions*." (emphasis added)).

Protection against ordinary competition is not a legitimate business interest.  *See White*, 226 So. 3d at 785.  Rather, "a legitimate business interest is a business asset that, if misappropriated, would give its new owner an unfair competitive advantage over its former owner." *Id.* at 784–85.  Under Florida law, legitimate business interests include: trade secrets, "valuable confidential business or professional information that otherwise does not qualify as trade secrets, substantial relationships with specific prospective or existing customers, and customer goodwill associated with a specific geographic location or a specific marketing or trade area." *Atomic Tattoos, LLC v. Morgan*, 45 So. 3d 63, 65 (Fla. Dist. Ct. App. 2010); *accord* Fla. Stat. § 542.335(1)(b) (defining the legitimate business interests that will support a valid restrictive covenant).

The party seeking to enforce a restrictive covenant must demonstrate that the covenant is justified by "one or more legitimate business interests." *See Rauch*, 313 So.

3d at 630; *accord Evans v. Generic Sol. Eng'g, LLC*, 178 So. 3d 114, 116 (Fla. Dist. Ct. App. 2015) ("The party seeking enforcement of the non-compete agreement must present a prima facie case that the restrictions are reasonably necessary to protect its legitimate business interests."); *JonJuan Salon, Inc. v. Acosta*, 922 So. 2d 1081, 1084 (Fla. Dist. Ct. App. 2006) ("Anyone seeking enforcement of a restrictive covenant must prove the existence of one or more legitimate business interests justifying the restrictive covenant."). Determining "whether an activity qualifies as a protected legitimate business interest under the statute is inherently a factual inquiry, which is heavily industry- and context-specific." *Day v. Hydrologic Distrib. Co.*, 397 So. 3d 776, 778 (Fla. Dist. Ct. App. 2024) (quotation omitted); *accord Alonso-Llamazares v. Int'l Dermatology Rsch., Inc.*, 339 So. 3d 385, 393 (Fla. Dist. Ct. App. 2022).

Sunbelt contends that the restrictive covenants within Joseph's employment agreement are necessary to protect a litany of legitimate business interests. (Dkt. 30 at 4, 10–13; *see* Dkt. 29 ¶ 110.) To begin, Sunbelt asserts that the restrictive covenants "are necessary to protect . . . its confidential customer information, pricing structures, proprietary business methods, and other competitively sensitive data." (Dkt. 30 at 11.) It later posits that the restrictive covenants are needed to protect its "customer-specific pricing strategies, customer lists, sales methods, and detailed operational practices." (*Id.*) Finally, Sunbelt alleges that the restrictive covenants are necessary to protect its "customer relationships and goodwill." (*Id.* at 13.) To be sure, several of the interests that Sunbelt cites are legitimate business interests that may justify restrictive covenants within an employment agreement. *See* Fla. Stat. § 542.335(1)(b); *see also Atomic Tattoos,*

- 19 -

*LLC*, 45 So. 3d at 65.  Still, Sunbelt's descriptions of its purported interests are too generic to meet its burden.  (*See* Dkt. 30 at 4, 11–13.)  So are its assertions that the covenants are reasonably necessary to protect its purported legitimate business interests.  (*See id.* at 11.)  *See Evans*, 178 So. 3d at 116.

For example, Florida recognizes that the protection of "[v]aluable confidential business or professional information" is a legitimate business interest.  *See* Fla. Stat. § 542.335(1)(b)(2).  However, "not all information that a business deems confidential is sufficient to justify a restrictive covenant that precludes employment with a competitor."  *Crom, LLC v. Preload, LLC*, 380 F. Supp. 3d 1190, 1202 (N.D. Fla. 2019); *see Cont'l Grp., Inc. v. Kw Prop. Mgmt., LLC*, 622 F. Supp. 2d 1357, 1374 (S.D. Fla. 2009) ("[I]nformation that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to [the] protection [of a restrictive covenant]." (quotation omitted)); *accord AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004) ("[I]nformation that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to protection.").  Therefore, "[t]o sufficiently plead and prove a legitimate business interest in confidential or proprietary information, an employer must articulate the information that it deems confidential or proprietary."  *Blue-Grace Logistics, LLC v. Fahey*, 653 F. Supp. 3d 1172, 1179 (M.D. Fla. 2023) (citing *Passalacqua v. Naviant, Inc.*, 844 So. 2d 792, 796 (Fla. Dist. Ct. App. 2003)).  Here, Sunbelt states that the restrictive covenants are needed to protect its confidential customer information, proprietary business methods, and competitively sensitive information.

(*See* Dkt. 30 at 10–13.)  Still, it never explains what that information is or what makes it confidential, proprietary, or sensitive.  (*See id.*)  Given the conclusory nature of Sunbelt's allegations, the court cannot determine whether the restrictive covenants within Joseph's employment agreement truly protect Sunbelt's "valuable confidential business or professional information," and if they do, whether they are reasonably necessary to protect those interests.  *See Rauch*, 313 So. 3d at 630; *see also Lucky Cousins Trucking, Inc. v. QC Energy Res. Tex., LLC*, 223 F. Supp. 3d 1221, 1226 (M.D. Fla 2016) ("Generic allegations do not establish a legitimate business interest.").

　　Sunbelt's claim that the covenants are necessary to protect its customer lists and pricing terms is similarly deficient.  (*See* Dkt. 30 at 4, 11–13.)  The mere identity of Sunbelt's clients and the terms of its pricing may not be sufficient to justify a restrictive covenant.  *See Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1234 n.11 (11th Cir. 2009); *GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1335 (M.D. Fla. 2010) (explaining that the identity of an employer's clients and terms of its pricing may not constitute legitimate business interests supporting a restrictive covenant, unless the employer can show that the information "derive[s] economic value from not being readily ascertainable [to] others who can obtain economic value from their disclosure or use or that they are the subject of reasonable efforts to maintain their secrecy"); *Veterinary Orthopedic Implants, Inc. v. Haas*, No. 3:20-CV-868-J-34MCR, 2020 WL 5369087, at *10 (M.D. Fla. Sept. 8, 2020) ("[T]he mere identity of clients or pricing terms may not be sufficient to justify a restrictive covenant, where the employer fails to show that this data derives economic value from not being readily ascertainable by

others who can obtain economic value from their disclosure." (quotation omitted)). Although a customer list may, in some cases, receive protection as a trade secret, the movant must show that the list was "acquired or compiled through the industry of the owner of the list and [is] not just a compilation of information commonly available to the public." *Bridge Fin., Inc. v. J. Fischer & Assocs.*, 310 So. 3d 45, 48 (Fla. Dist. Ct. App. 2020); *accord Zodiac Recs., Inc. v. Choice Envtl. Servs., LLC*, 112 So. 3d 587, 590 (Fla. Dist. Ct. App. 2014) ("[A] former employer's customer relationships do not automatically qualify as trade secrets, even if a party's restrictive covenant attempts to characterize them as such. To qualify as a trade secret, there must be evidence that a customer list was the product of great expense and effort, that it included information that was confidential and not available from public sources, and that it was distilled from larger lists of potential customers into a list of viable customers for a unique business." (alteration adopted and quotation omitted)); *see* Fla. Stat. § 542.335(1)(b)(1). Sunbelt's passing references to its purported interest in protecting its customer list, client identities, and pricing terms are too perfunctory to meet its burden. (*See* Dkt. 30 at 4, 11–13.) For instance, Sunbelt does not describe the customer list that it reportedly seeks to protect, or the effort Sunbelt expended to create it. (*See id.*) Nor does it allege that the identity of its clients or the terms of its pricing are unavailable to its competitors, like BrandSafway. (*See id.*) At bottom, Sunbelt's conclusory analysis on this point fails to satisfy its burden to show that it has a legitimate business interest in protecting this information and that the restrictive covenants within Joseph's employment agreement are indeed reasonably necessary to protect those interests. *See*

*Sapuppo*, 739 F.3d at 681–82; *Rauch*, 313 So. 3d at 630; *see also Lucky Cousins Trucking, Inc.*, 223 F. Supp. 3d at 1226.

As to Sunbelt's relationships with Ron Kendall Masonry, Carvalho & Silva Construction, and WaveCrest Masonry, "the right to prohibit the direct solicitation of existing customers is a legitimate business interest." *See Evans*, 178 So. 3d at 116. Even so, "Florida law does not protect all customer relationships." *Props. of Vills., Inc. v. Kranz*, No. 5:19-CV-647-OC-30PRL, 2020 WL 5939942, at *1 (M.D. Fla. Oct. 7, 2020). "[A] party seeking enforcement of a restrictive covenant cannot rely on customer relationships as a legitimate interest unless the party pleads and proves the identity of specific customers and the substantiality of the relationship with those customers." *Vital Pharms., Inc.*, 23 F.4th at 1291 (concluding that "the district court abused its discretion" when it granted a preliminary injunction, despite the plaintiff's failure to "name and prove a substantial relationship with specific clients"). "[A]n analysis of Florida [caselaw] reveals that a substantial relationship is more likely to exist" if (1) "there is active, on-going business being conducted," (2) exclusivity, (3) "a customer who cannot be easily identified by other competitors in the industry," and (4) "an expectation of continued business." *IDMWORKS, LLC v. Pophaly*, 192 F. Supp. 3d 1335, 1340–41 (S.D. Fla. 2016); *accord Veterinary Orthopedic Implants, Inc.*, 2020 WL 5369087, at *9 (same); *see Evans*, 178 So. 3d at 117 (concluding that an employer failed to show that its former employee violated the restrictive covenant within his employment agreement, as the employer lacked a substantial relationship with a client with whom it did not have an exclusive relationship, and indeed, whom

- 23 -

the evidence showed, "hired a number of [the employer's] competitors to provide essentially the same services"). Presuming Sunbelt had an "active, on-going" business relationship with these customers, it has not provided evidence to suggest that the relationships were exclusive or that the customers could not be "easily identified" by competitors, like BrandSafway. (*See* Dkt. 29, Dkt. 30; *see also* Dkt. 42-1 ¶ 4 (suggesting that Sunbelt may not maintain exclusive relationships with its customers, as they seek the lowest bidder).) *See Anich Indus., Inc. v. Raney*, 751 So. 2d 767, 771 (Fla. Dist. Ct. App. 2000) (concluding that an employer failed to demonstrate that it had a legitimate business interest in protecting its "substantial relationships" with clients, where the evidence showed that its clients made their purchases "primarily on cost and the supplier's ability to provide the goods quickly"). At bottom, Sunbelt's allegations are not supported by the evidence and are further devoid of any specifics to establish any substantial customer relationships under Florida law.

Finally, Sunbelt has not shown that the restrictive covenants within Joseph's employment agreement are necessary to protect its interest in customer goodwill. (*See* Dkt. 30 at 4, 11–13.) Goodwill is "the expectancy of continued patronage," and encompasses "all the imponderable qualities that attract customers to . . . [a particular] business." *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555–56 (1993); *accord Thompson v. Thompson*, 576 So. 2d 267, 269 (Fla. 1991) ("Irrespective of the setting in which it is found, the meaning of goodwill does not change. It is property which attaches to and is dependent upon an existing business entity. . . [It] is property of an intangible nature commonly defined *as the expectation of continued public*

*patronage.*" (emphasis added)).   Sunbelt posits that the restrictive covenants within Joseph's employment agreement are necessary to protect its legitimate interest in customer goodwill, but it points to nothing in the record defining its alleged goodwill or explaining how the restrictive covenants within Joseph's employment prevent its competitors, like BrandSafway, from improperly obtaining its customer goodwill. (*See* Dkt. 30 at 4, 11–13.)   To obtain a preliminary injunction enforcing a restrictive covenant, a party must do more than simply assert that a restrictive covenant is necessary to protect its goodwill with customers.  *See Vital Pharms., Inc.*, 23 F.4th at 1291; *Lucky Cousins Trucking, Inc.*, 223 F. Supp. 3d at 1226 ("Generic allegations do not establish a legitimate business interest."); *see also Props. of Vills., Inc. v. Kranz*, No. 5:19-CV-647-OC-30PRL, 2020 WL 6270932, at *8 (M.D. Fla. Aug. 14, 2020) ("It is not enough to merely assert the concept of goodwill.").   Given the conclusory nature of its allegations on this point, Sunbelt has not shown that the restrictive covenants in Joseph's employment agreement are necessary to prevent the improper transfer of customer goodwill tied to its Central Florida operations to its competitor's operations in the same location or area.  (*See* Dkt. 30 at 4, 11–13.)  *See Sapuppo*, 739 F.3d at 681–82; *Markovich*, 95 F.4th at 1379; *see also Vital Pharms., Inc.*, 23 F.4th at 1291; *Thompson*, 576 So. 2d at 269.

In sum, to show that it was likely to succeed on the merits of its breach of contract claim, Sunbelt needed to show that the restrictive covenants within Joseph's employment agreement were reasonably necessary to support one or more legitimate business interests.  *See Evans*, 178 So. 3d at 116 ("The party seeking enforcement of the

non-compete agreement must present a prima facie case that the restrictions are reasonably necessary to protect its legitimate business interests."); Fla. Stat. § 542.335(1)(b)(3) ("The person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant."). Sunbelt's conclusory allegations are insufficient to meet its burden and, as a result, it has not shown that it is substantially likely to succeed on the merits of its breach of contract claim. (*See* Dkt. 30 at 4, 11–13.) *See Sapuppo*, 739 F.3d at 681–82; *Rauch*, 313 So. 3d at 630. For this reason, Sunbelt's motion for a preliminary injunction must be denied. *See TransUnion Risk & Alt. Data Sols., Inc.*, 625 F. App'x at 405 (explaining that preliminary injunctions "should not be issued unless the moving party clearly establishes each of the four prerequisites"); *Anich Indus.*, 751 So. 2d at 771 (affirming the denial of a motion for a preliminary injunction where the employer failed to demonstrate that legitimate business interests supported the restrictive covenants at issue). Accordingly, the court need not address the other prerequisites. *See McMahon*, 455 F. App'x at 878 ("If the plaintiff fails to show a substantial likelihood of success on the merits, the court need not consider the other requirements."). Nonetheless, the court addresses the issue of irreparable harm.

## C. Irreparable Harm

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Indeed, such a showing is the "sine

qua non of injunctive relief." *Id.* To satisfy Rule 65, a plaintiff must show that their irreparable injury is "neither remote nor speculative, but actual and imminent." *SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.*, 243 F. App'x 502, 504 (11th Cir. 2007); *see Coccaro v. GEICO Gen. Ins. Co.*, 648 F. App'x 876, 879 (11th Cir. 2016) ("A plaintiff seeking declaratory or injunctive relief must allege and ultimately prove a real and immediate—as opposed to a merely hypothetical or conjectural—threat of future injury." (alteration adopted and quotation omitted)); *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994) ("Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical— threat of future injury." (emphasis added)); *St. Lucie County v. St. Lucie Vill.*, 603 So. 2d 1289, 1293 (Fla. Dist. Ct. App. 1992) ("To be the subject of an injunction, a prospective injury must be more than a remote possibility; it must be so imminent and probable as reasonably to demand preventive action by the court. In other words, the feared injury must be so near and present that the only way to avoid it is through injunctive relief." (citation omitted)).

As discussed, Sunbelt seeks a preliminary injunction to enforce several restrictive covenants within Joseph's employment agreement. (*See* Dkt. 30.) Section 542.335 governs restrictive covenants in Florida, and provides "the substantive state law to which courts look in analyzing, evaluating[,] and enforcing restrictive covenants contained in employment contracts." *TransUnion Risk & Alt. Data Sols., Inc.*, 625 F. App'x at 405 (quotation omitted). Because section 542.335 is substantive, as opposed

to procedural, federal courts in this state should apply "Rule 65 and section 542.335 in a . . . harmonious fashion," when exercising diversity jurisdiction. *Id.* at 406.

Under section 542.335, "[t]he violation of an enforceable restrictive covenant creates a [rebuttable] presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." *Proudfoot Consulting Co.*, 576 F.3d at 1231 (quotation omitted); *see Medco Data, LLC v. Bailey*, 152 So. 3d 105, 107 (Fla. Dist. Ct. App. 2014) (explaining that a defendant may rebut the presumption of irreparable injury by pointing to evidence establishing its absence). Still, the presumption "does not relieve [Sunbelt] of its procedural burden" to establish that it will suffer irreparable injury absent injunctive relief; rather, "it prescribes how irreparable injury is established in the restrictive covenant context." *TransUnion Risk & Alt. Data Sols., Inc.*, 625 F. App'x at 406; *accord Surgery Ctr. Holdings, Inc. v. Guirguis*, 318 So. 3d 1274, 1280 (Fla. Dist. Ct. App. 2021) (explaining that the practical effect of section 542.335's presumption of irreparable harm is that a plaintiff "need not directly prove that the defendant's specific activities will cause irreparable injury if not enjoined." (quotation omitted)); *see Vital Pharms., Inc.*, 23 F.4th at 1298 (explaining that "it will be [only] the rare case that comes out one way in the federal court and another way in the state court if the federal court fail[s] to apply the . . . presumption [of irreparable harm in section 542.335] at the preliminary[ ]injunction stage.") (Pryor, J., concurring).

Consequently, even if Sunbelt could prove that Joseph violated "an enforceable restrictive covenant" in his employment agreement, *Surgery Ctr. Holdings, Inc.*, 318 So. 3d at 1280, it must still show that the resulting harm is imminent, *Wreal, LLC v.*

*Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A preliminary injunction requires showing 'imminent' irreparable harm."). That is because "the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Id.; accord Berber v. Wells Fargo Bank, N.A.*, 760 F. App'x 684, 687 (11th Cir. 2019) (same); *Allied Universal Corp. v. Given*, 223 So. 3d 1040, 1044 (Fla. Dist. Ct. App. 2017) (explaining that Florida adopted the presumption of irreparable injury in actions to enjoin violations of restrictive covenants because it recognized the need for swift action in such cases).

A plaintiff's "failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Wreal, LLC*, 840 F.3d at 1248. "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—*militates against a finding of irreparable harm*." *Id.* (emphasis added); *accord Powers*, 806 F. App'x at 959 (same); *see Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 467 (M.D. Fla. 2022) ("[U]nexplained delays of a few months negate any claim of irreparable harm on a preliminary injunction motion[,] and many courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months."). Thus, a plaintiff "must generally show [that they acted with] reasonable diligence" in seeking injunctive relief. *See Benisek*, 585 U.S. at 159.

Injunctive relief is inappropriate here because Sunbelt did not diligently pursue relief in this case. As discussed, Joseph separated from Sunbelt in July 2025. (Dkt. 29 ¶ 37.) Sunbelt soon learned that Joseph had joined one of its primary competitors in

Central Florida. (*See id.* ¶¶ 37–40; Dkt. 29-1 at 3–4, 12; Dkt. 30 at 5.) Between October and December, Sunbelt learned that Joseph toured a worksite in Kissimmee, rented equipment to one of its customers for a worksite in Titusville, and may have sent a colleague to a worksite in Orlando, all in violation of the non-compete and non-solicitation provisions in his employment agreement. (*See* Dkt. 29 ¶¶ 46–56, 60–61, 97; Dkt. 29-1 at 24, 29–30; Dkt. 30-1 at 2–7.)

Rather than take swift action to involve the court, Sunbelt engaged in a months-long dialogue with BrandSafway, often allowing BrandSafway several weeks to respond to its concerns and requests for information. (*See* Dkt. 29 ¶¶ 84–106; Dkt. 29-1 at 24–44; Dkt. 30 at 3 ("Sunbelt made repeated, but unsuccessful efforts to persuade all Defendants to abide by the promises that . . . Joseph agreed to in his [e]mployment [a]greement.").) *See Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, No. 22-14257, 2023 WL 3704912, at \*4 (11th Cir. May 30, 2023) (rejecting an assertion that time spent negotiating a settlement before requesting injunctive relief should not be considered in determining whether the movant acted consistent with its claim of irreparable harm). For instance, Sunbelt learned that Joseph had accepted a "competitive role selling scaffolding services" shortly after his resignation. (*See* Dkt. 29 ¶¶ 37–40, 84–85.) It also knew that Joseph "sent a scaffolding quote containing Sunbelt's confidential information to his personal address" before resigning his position at Sunbelt. (*See id.* ¶¶ 85–86.) Accordingly, Sunbelt contacted Joseph and BrandSafway, requesting information about his new role and seeking assurances that he would comply with his employment agreement going forward. (*See*

*id.* ¶ 84.)  BrandSafway responded several weeks later but failed to address most of the issues raised in Sunbelt's letter.  (*See* Dkt. 29 ¶ 91–92; Dkt. 29-1 at 25–26.)  Yet it does not appear that Sunbelt pressed BrandSafway for a more complete response or made further attempts to resolve Joseph's purported violations of the restrictive covenants within his employment agreement.  (*See* Dkt. 29-1 at 18, 25–26.)

Sunbelt's unhurried approach to resolving this dispute is underscored by its response to Joseph's purportedly renting scaffolding equipment to one of its clients for a worksite in Titusville and allegedly visiting a prospective client's worksite in Kissimmee.  For instance, after Joseph rented scaffolding to one of its customers, Sunbelt contacted BrandSafway to request assurances that Joseph would comply with the restrictive covenants in his employment agreement.  (*See* Dkt. 29 ¶¶ 93, 98; Dkt. 29-1 at 24.)  BrandSafway purportedly failed to provide a substantive response for more than a month.  (*See* Dkt. 29 ¶ 94.)  Despite the delay, Sunbelt does not appear to have taken any action to expedite the resolution of this perceived violation, to obtain the information and assurances it sought, or to involve the court.  (*See id.* ¶¶ 93–97; Dkt. 29-1 at 24, 29–30.)  Similarly, after Sunbelt learned that Joseph visited the prospective client's worksite in Kissimmee, it appears to have waited more than a month before contacting BrandSafway.  (*See* Dkt. 29 ¶ 50; Dkt. 29-1 at 32–41.)

These violations purportedly occurred as Sunbelt received fewer orders from clients who reportedly generated hundreds of thousands of dollars in revenue the year before.  (*See* Dkt. 29 ¶¶ 64–66, 69–72, 75–83.)  Although Sunbelt blames Joseph for the lost revenue, it waited until March 2026—eight months after it first learned that Joseph

was potentially competing within his prior territory, five months after it learned that he had rented equipment for a client's worksite in Titusville, and three months after it learned that he had toured a worksite in Kissimmee—to ask the court to intervene. (*See* Dkt. 1, Dkt. 2, Dkt. 29 ¶¶ 66, 76–83, 93–96, 100.)

Ultimately, the allegations in the amended complaint, coupled with Sunbelt's lack of urgency, tend to neutralize any presumption that Sunbelt will suffer irreparable harm absent injunctive relief.  *See Benisek*, 585 U.S. at 159 ("[A] party requesting a preliminary injunction must generally show reasonable diligence."); *Wreal, LLC*, 840 F.3d at 1248 (noting that a plaintiff's delay in seeking injunctive relief "militates against a finding of irreparable harm"); *see also TransUnion Risk & Alt. Data Sols., Inc.*, 625 F. App'x at 406 (explaining that Florida's presumption of irreparable injury does not eviscerate the requirements of Rule 65, but must be applied in tandem with traditional principles governing injunctive relief).  The court therefore need not address whether Sunbelt's threatened injury outweighs the harm that the preliminary injunction would cause to Defendants or whether injunctive relief would be averse to the public interest.  *See Siegel*, 234 F.3d at 1176 ("[E]ven if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper.").

Accordingly, Plaintiff Sunbelt Rentals, Inc.'s Amended Motion for Preliminary Injunction (Dkt. 30) is **DENIED**.

- 33 -

**ORDERED** in Orlando, Florida, on June 2, 2026.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record